## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

KELLEY R. MILLS,                        §
                                        §
            Plaintiff,                  §
                                        §
vs.                                     §          CIVIL ACTION NO. 11-CV-01090
                                        §
MICHAEL J. ASTRUE,                      §
COMMISSIONER OF SOCIAL                  §
SECURITY,                               §
                                        §
            Defendant.                  §

### MEMORANDUM AND RECOMMENDATION ON
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 2).  Cross-motions for summary judgment have been filed by Plaintiff Kelley R. Mills ("Plaintiff," "Mills"), and Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary Judgment and Supporting Brief ["Plaintiff's Motion"], Docket Entry #11); (Defendant's Cross-Motion for Summary Judgment, Docket Entry #9); (Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry # 10).  Each party has responded in opposition to the other's motion. (Reply to Plaintiff's Motion for Summary Judgment and Supporting Brief ["Defendant's Response"], Docket Entry # 12); (Plaintiff's Reply Brief In Response to Defendant's Reply to Plaintiff's Motion for Summary Judgment ["Plaintiff's Reply"], Docket Entry #13).  After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

**BACKGROUND**

On December 11, 2008, Plaintiff Kelley Raye Mills filed an application for disability insurance benefits under Title II of the Social Security Act ("the Act").  (Transcript ["Tr."] 21). Plaintiff claimed that her disability began on October 24, 2008, due to "symptoms from her narcolepsy condition."  (Tr. 25).  The SSA initially denied her application for benefits on August 19, 2009.  (Tr. 21).  Plaintiff petitioned the SSA to reconsider that decision, but that request was also denied.  (*Id.*).

On December 11, 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 71).  That hearing, before ALJ Gary J. Suttles, took place on April 7, 2010.  (Tr. 33).  Plaintiff appeared with an attorney, Douglas Lyons, Jr. ("Mr. Lyons"), and she testified in her own behalf.  (Tr. 21, 35-56).  The ALJ also heard testimony from a vocational expert witness, Herman Litt ("Mr. Litt").  (Tr. 21, 56-61).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in  Appendix   1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.  If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

2

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any kind of substantial gainful work which exists

in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Mills had "not engaged in substantial gainful activity since October 24, 2008, the alleged onset date." (Tr. at 23). Further, the ALJ concluded that Mills suffered from "narcolepsy and cervical musculoskeletal pain." (*Id.*). Although he determined that these impairments were "severe," the ALJ decided that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the applicable SSA regulations. (Tr. at 23). The ALJ concluded that Plaintiff's residual functional capacity ("RFC") allowed her "to perform sedentary work as defined in 20 CFR 404.1567(a)." (Tr. at 24). The ALJ found that Plaintiff has,

> the ability to sit 6 hours total in an 8 hour day; stand/walk 2 hours total in an 8 hour day; and lift/carry no more than 10 pounds at a time. The claimant's ability to push and pull is unlimited, and she can bend, stoop, crouch, crawl, balance, twist, and squat. She can occasionally climb stairs, but can never run or climb ladders, ropes, or scaffolds. Further, the claimant's exposure to dust, fumes, gases, chemicals, heights, dangerous machinery, and uneven surfaces must be limited. There is no mental impairment.

(Tr. at 24-25). Based on those abilities, the ALJ determined that Mills was capable of performing her past work as a secretary, executive assistant, and administrative assistant. (Tr. at 28). For that reason, he found that Mills "has not been under a disability, as defined in the Social Security Act, [since] October 24, 2008," and he denied her application for insurance benefits on April 23, 2010. (Tr. at 29).

On June 18, 2010, Plaintiff requested an Appeals Council Review of the ALJ's decision. (Tr. at 6). The Appeals Council found no reason to review the ALJ's decision and denied her request, on January 10, 2011. (Tr. at 1). With that ruling, the ALJ's findings became final, and, on March 10, 2011, Mills filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry #1). After

a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

## STANDARD OF REVIEW

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her condition; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

## DISCUSSION

In her motion, Mills asks the court to reverse the ALJ's decision and award her benefits, or, in the alternative, to remand the case for additional administrative proceedings. (*See* Plaintiff's Motion 21-22). Plaintiff argues that the ALJ "failed to follow the opinion of [Mills']

Treating Physician who found [her] disabled." (Plaintiff's Motion at 9, 20). Plaintiff next complains that the ALJ did not evaluate her diagnosis of narcolepsy under Listing 11.03, as he should have. (*Id.* at 5). Finally, Mills claims that the ALJ "placed himself in the role of Doctor" because he did not hear testimony from a medical expert regarding her impairments. (*Id.* at 6). Defendant, on the other hand, insists that the "[t]he ALJ properly evaluated Plaintiff's claim using relevant legal precedent, and substantial evidence supports his decision [that] [] Plaintiff [is] not disabled." (Defendant's Motion at 12).

### *Medical Facts, Opinions, Diagnosis*

The earliest available records detail Plaintiff's visits to her general practitioner, Jonathon B. Shaffer, M.D. ("Dr. Shaffer"), from April 1994 to March 2010. (Tr. 289-339, 544-549). Plaintiff sought treatment from Dr. Shaffer for a range of ailments, but she was treated primarily for narcolepsy and musculoskeletal pain. (Tr. 289-339). From 1994 to 1999, Plaintiff's chief complaint was pain. (Tr. 308-323). In June 1998, however, Dr. Shaffer reported that Lortab "helped her," and that Plaintiff's "back pain [was] controlled on med[ication]s." (Tr. at 318, 320). In April 1999, Dr. Shaffer changed Plaintiff's pain medication to Soma,[1] and in May 2000, he found her to have "fair control on Soma." (Tr. 306-07).

On May 3, 1999, Plaintiff first complained about sleep disturbance. She reported that she had insomnia, and Dr. Shaffer prescribed diphenhydramine.[2] (Tr. 311). Two years later, on April 2, 2001, Mills told Dr. Shaffer that she had experienced "w[eigh]t loss," because of her "chronic sleep problems." (Tr. 304). Plaintiff did not see Dr. Shaffer again until May 2004, three years later. (Tr. 303). At that visit, Mills told Dr. Shaffer that she had fallen "asleep while

---

[1] Soma, or "Carisoprodol," is "a skeletal muscle relaxant, chemically related to meprobramate. It appears to give relief in muscular disorders involving pain and spasm, e.g. strains and sprains." STEDMAN'S MEDICAL DICTIONARY 230 (27th ed. 2000).
[2] "Diphenhydramine is used to relieve red, irritated, itchy, watery eyes; sneezing; and runny nose caused by hay fever, allergies, or the common cold. Diphenhydramine is also used to relieve cough caused by minor throat or airway irritation. Diphenhydramine is also used to prevent and treat motion sickness, and to treat insomnia (difficulty falling asleep or staying asleep). U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/ pubmedhealth/PMH0000704/ (last visited July 6, 2012).

having [a] conversation." (*Id.*).  Plaintiff reported that she did not sleep well; that she frequently

woke at night; and that she felt "confused [and] disoriented in [the] morning." (*Id.*).  Dr. Shaffer

noted that Plaintiff's sleep difficulties had worsened, and that she suffered from "daytime

drowsiness." (*Id.*).  On August 19, 2004, Dr. Shaffer noted that Plaintiff was "still falling asleep

easy[ily]." (Tr. 301).  She claimed to "nod[] out behind the wheel," and "fall asleep at work."

(Tr. 301).  Dr. Shaffer reported these symptoms to be signs of "hypersomnia."[3] (*Id.*).  Plaintiff

also told the doctor that she had "difficulty falling asleep," "difficulty going back to sleep," and

that she walked in her sleep. (*Id.*).  Based on these complaints, Dr. Shaffer recommended that

she undergo a sleep study. (*Id.*).

On November 12, 2004, Plaintiff participated in a "Diagnostic Polysomnogram,"[4] which

revealed "a sleep efficiency of 94.9%," as well as "an adequate amount of REM sleep for a valid

assessment of sleep apnea." (Tr. 400-01).  The tests indicated that Plaintiff suffered from

"[m]oderate obstructive sleep apnea[5] ("OSA") syndrome," and "[s]ignificant hypoxemia[6] with

respiratory events." (Tr. 401).  Dr. Shaffer recommended that Plaintiff "[r]eturn to the sleep

center for a second night study to titrate[7] [her] CPAP."[8] (*Id.*).

---

[3] "Hypersomnia is characterized by recurrent episodes of excessive daytime sleepiness or prolonged nighttime sleep. Different from feeling tired due to lack of or interrupted sleep at night, persons with hypersomnia are compelled to nap repeatedly during the day, often at inappropriate times such as at work, during a meal, or in conversation. These daytime naps usually provide no relief from symptoms. Patients often have difficulty waking from a long sleep, and may feel disoriented."  U.S. National Library of Medicine, http://www.ninds.nih.gov/disorders/hypersomnia/hypersomnia.htm (last visited July 6, 2012).

[4] A polysomnogram is "done to diagnose possible sleep disorders, including obstructive sleep apnea (OSA)." Narcolepsy is another sleep disorder that a polysomnogram may be used to diagnose.  U.S. National Library of Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/003932.htm (last visited July 9, 2012).

[5] Sleep apnea is "a sleep disorder characterized by periods of an absence of attempts to breathe.  The person is momentarily unable to move respiratory muscles or maintain airflow through the nose and mouth."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 1503 (5th Ed. 1998).

[6] Hypoxemia is "an abnormal deficiency of oxygen in the arterial blood."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 804 (5th Ed. 1998).

[7] "Titrate" is "to analyze volumetrically by a solution of known strength to an end point."  STEDMAN'S MEDICAL DICTIONARY 1452 (27th ed. 2000).

[8] "CPAP" is an acronym for "continuous positive airway pressure," which "is a method of noninvasive ventilation assisted by a flow of air delivered at a constant pressure throughout the respiratory cycle.  It is performed for patients who can initiate their own respirations but who are not able to maintain adequate arterial oxygen levels without assistance."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 392 (5th Ed. 1998).

The second study took place on December 7, 2004.  (Tr. 405).  That study revealed that Plaintiff slept 4.2 of the 5.3 hours she was there, "with a sleep efficiency of 79.2%."  (*Id.*). However, Mills "was unable to continue the study due to congestion and [an] inability to tolerate the CPAP."  (*Id.*).  Dr. Shaffer recommended that Plaintiff "consider a dental orthotic as an alternative therapy for [her] OSA," and that, "if clinically indicated," she "consider an ENT[9] evaluation for surgical intervention."  (Tr. 406).

Plaintiff next saw Dr. Shaffer on December 16, 2004.  (Tr. 300).  At that visit, she complained of "athetotic[10] neck/head movements," a "right shoulder lipoma,"[11] "patellar tendonitis," and continued sleep problems.  (*Id.*).  She reported a "poor tolerance of [her] CPAP apparatus," and told the doctor that she had fallen asleep while driving.  (*Id.*).  Dr. Shaffer recommended "no driving," and referred her for another sleep study the following month.  (*Id.*). That study took place on January 6, 2005.  (Tr. 396).  During the exam, Plaintiff slept 5.1 of 5.4 hours, "with a sleep efficiency of 93.7%."  (*Id.*).  Mills "tolerated" the CPAP machine "well," and the results showed that Plaintiff's "[o]bstructive sleep apnea [was] treated effectively."  (Tr. 397).  Further, the following recommendations were made to Mills, to assist her with her sleep disturbances:

> The patient should be followed closely the first month to ensure that she develops good compliance and wears the CPAP all night, every night from the beginning. She should be monitored for problems with mask fit, or nasal complications, as well as to ensure that her sleep disturbance and excessive daytime sleepiness are improving.

(*Id.*).  The next week, Plaintiff visited her dentist, Teresa A. Cody, DDS ("Dr. Cody").  Dr. Cody agreed that Mills would "benefit from oral appliance therapy," and she fitted her with a

---

9 "ENT" is an "abbreviation for ear, nose, and throat."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 567 (5th Ed. 1998).
10 Athetotic, or "atheosis," is "a condition in which there is a constant succession of slow, writhing, involuntary movements of flexion, extension, pronation, and supination of the fingers and hands, and sometimes the toes and feet."  STEDMAN'S MEDICAL DICTIONARY 136 (27th ed. 2000).
11 A lipoma is "a benign tumor consisting of mature fat cells."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 947 (5th Ed. 1998).

"mandibular repositioning device [] to maintain an open airway during sleep with concurrent use to the CPAP . . . device." (Tr. at 326).

The next time that Plaintiff saw Dr. Shaffer, on May 24, 2005, she reported that she had obtained a "mouth-piece," but that her "sleep problems" continued.  (Tr. 299).  Mills told Dr. Shaffer that she "wrecked her car falling asleep," and that she was "not driving."  (*Id.*).  Dr. Shaffer recommended that Plaintiff consult with Mauricio A. Reinoso, MD ("Dr. Reinoso"), a sleep medicine specialist.  (*Id.*).  On July 11, 2005, Dr. Shaffer found that Plaintiff continued to suffer from "daytime somnolence."  (Tr. 298).  He reported that Mills was "now being followed by Dr. Reinoso," but despite that fact, he recommended "trial adderall XR"[12] to treat her "narcolepsy/sleep apnea."  (Tr. 298).  Dr. Shaffer saw Mills again on July 20, 2005, and she complained of "[righ]t buttock pain" and a "numb [righ]t foot" on that date.  (Tr. 297).  Plaintiff reported that the pain "started [as] minimal," but grew "worse over time," and that her "foot [was] numb to [her] ankle."  (*Id.*).  Dr. Shaffer found that Plaintiff suffered from a decreased range of motion in her back, and he added "Medrol" [13] and "Vicodin,"[14] to the Soma prescription, to treat Plaintiff's pain.  (*Id.*).

At Plaintiff's next visit to Dr. Shaffer, on June 22, 2006, he reported that she suffered from "chronic cervical pain," but that she "does ok [on] Soma."  (Tr. at 296).  Mills told the doctor that she "often [had] pain [in her] knees and ankles," and he "discussed yoga, pilates,

---

[12] Adderall is "[t]he combination of dextroamphetamine and amphetamine[,] [and]  is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder [] in adults and children. Dextroamphetamine and amphetamine tablets are also used to treat narcolepsy [] .The combination of dextroamphetamine and amphetamine is in a class of medications called central nervous system stimulants. It works by changing the amounts of certain natural substances in the brain." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000166/ (last visited July 27, 2012).

[13] Medrol, or "Methylprednisolone," is "a glucocorticoid.  It is prescribed in the treatment of inflammatory conditions, including rheumatic fever and rheumatoid arthritis."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 1024 (5th Ed. 1998).

[14] "Vicodin contains a combination of acetaminophen and hydrocodone.  Hydrocodone is in a group of drugs called opioid pain relievers. . . .Vicodin is used to relieve moderate to severe pain."  Drugs.com, http://www.drugs.com/vicodin.html (last visited July 9, 2012).

9

nutrition," and "glucosamine/chondroitin"[15] with her.  (*Id*.).  On that date, Dr. Shaffer noted their "lengthy discussion regarding her life's response to [narcolepsy]," during which Plaintiff said that "she is dissatisfied" with her treatment.  (*Id*.).  Mills told Dr. Shaffer that she planned to "seek [a] second opinion."  (*Id*.).

On July 31, 2007, Plaintiff complained to Dr. Shaffer of "left knee pain" and "occasional swelling."  (Tr. 293).  The doctor recommended "glucosamine," as well as "Naprosyn."[16]  (*Id*.).  Mills told Dr. Shaffer that her "narcolepsy [was] better," and that she had "learned what works for [her]." (*Id*.).  After this date, Plaintiff no longer complained of pain, but the records show that she continued to use Soma.  (Tr. 291, 292).

Plaintiff next saw Dr. Shaffer on June 26, 2008.  (Tr. 291).  At that time, Dr. Shaffer observed that Mills "did poorly [on] Provigil," and that she "sleeps all the time."  (*Id*.).  Dr. Shaffer prescribed a "trial [of] Phentermine."[17]  (*Id*.).  Plaintiff visited Dr. Shaffer again, on October 23, 2008, and claimed that the pharmacy "shorted" her prescription for Soma.  (Tr. 290).  On April 27, 2009, Plaintiff saw Dr. Shaffer for a "B[lood] P[ressure] check and L[eft] shoulder pain."  (Tr. 289).  On that date, the doctor reported that Mills' pain affected her "traps and deltoid" and that she "can't wash [her] hair."  (*Id*.).  He also noted, however, that she received a "benefit" from Soma.  (*Id*.).  During that visit, Dr. Shaffer reported that, although he had "prescribed Phentermine [in] 6/08, [Mills had] no[t] tried [it] yet." (*Id*.).  The same day, Plaintiff told Dr. Shaffer that she "got laid off" and that she had "appl[ied] for disability."  (*Id*.).

---

[15] Glucosamine is "sugar protein that is believed to help develop and renew cartilege [], and keep it lubricated for better joint movement and flexibility."  Chondroitin is "a naturally occurring substance formed of sugar chains. Chondroitin is believed to help the body maintain fluid and flexibility in the joints. . . . The combination of chondroitin and glucosamine is used to aid in maintaining healthy joints."  Drugs.com, http://www.drugs.com/mtm/chondroitin-and-glucosamine.html (last visited July 27, 2012).

[16] Naprosyn, or "Naproxen," is "a nonsteroidal anti-inflammatory agent.  It is prescribed for the relief of inflammatory symptoms of arthritis."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 1079 (5th Ed. 1998).

[17] Phentermine is "a stimulant that is similar to an amphetamine. Phentermine is an appetite suppressant that affects the central nervous system.  Phentermine may also be used for other purposes."  Drugs.com, http://www.drugs.com/phentermine.html (last visited July 10, 2012).

On June 7, 2005, Mills was first treated by Dr. Reinoso, who noted her history of hypersomnia.  (Tr. 542).  He also reported that she sought treatment "for sleep apnea."  (*Id*.).  Although she had previously obtained a dental appliance, she did not "want to use [it] with [the] CPAP."  (*Id*.).  On August 30, 2005, Dr. Reinoso reviewed with Plaintiff the results of a sleep study.  (Tr. 541).  From that study, Dr. Reinoso diagnosed Plaintiff as suffering from "probable narcolepsy," but without cataplexy[18] or sleep paralysis.  (*Id*.).  Dr. Reinoso prescribed Provigil and cautioned Mills against "driving and operating dangerous machinery until [her] condition is treated and [her] daytime sleepiness is eliminated."  (Tr. 537, 541).  Dr. Reinoso added that, "Narcolepsy is a life long condition, which requires life style changes with better sleep hygiene and taking frequent and planned naps."  (Tr. 537).  On September 12, 2005, Dr. Reinoso noted that Plaintiff's "hypersomnolence [was] better"; that she was "sleeping better"; and that she had "no cataplexy."  (Tr. 540).  Mills also told Dr. Reinoso that she "only twice fell asleep after lunch."  (*Id*.).  Two weeks later, Plaintiff returned to Dr. Reinoso and was "still doing well."  (Tr. 539).

On December 5, 2005, Plaintiff underwent another sleep study, during which she slept for 7.9 of the 8.1 hours she was studied, with a "sleep efficiency of 97.1%."  (Tr. 532).  That study revealed that Mills experienced "moderate snoring during the night in all positions with significant sleep apnea."  (*Id*.).  Dr. Reinoso determined that there was "objective evidence of significant daytime hypersomnolence[,] despite treatment with stimulants," and he diagnosed Mills as suffering from "narcolepsy without cataplexy."  (Tr. 533).  Dr. Reinoso adjusted Mills' medication and recommended that she "avoid driving or operating potentially dangerous machinery" until her narcolepsy was better controlled.  (*Id*.).

---

[18] "Cataplexy" is "a condition characterized by sudden muscular weakness and hypotonia, caused by emotions, such as anger, fear, or surprise, often associated with narcolepsy."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 282 (5th Ed. 1998).

On July 21, 2009, Alan Cororve, M.D. ("Dr. Cororve") examined Mills on behalf of the Texas Rehabilitation Commission.   (Tr. 475-46).   Dr. Cororve reported Plaintiff's medical history as follows:

> The patient is a 50 year old female who says she has cervical disc problems leading to shoulder blade pain and numbness in her left hand.  She claims she will feel numb in her hand 4 days out of 7.  This will last for a few hours.  The patient is right handed.  Occasionally she may drop items but is able to use her hand without difficulty.  The left shoulder blade bothers her 3 times a week.  She has undergone physical therapy which did provide relief.  Surgery has been suggested to be delayed as long as possible.  She has seen a sleep specialist and was told she has narcolepsy.  The patient has undergone 7 sleep studies and has been told "nothing can be done."  She falls asleep standing up and does not drive a vehicle any longer.  She had fallen asleep behind the wheel and had an accident.  She has been tried on [P]rovigil.  Her primary physician suggested treatment with amphetamines, and the patient filled the prescription but did not want to take the medication.

(Tr. 475).  During his examination, Dr. Cororve found that Plaintiff "had full range of motion of all joints examined in the upper and lower extremities using active and passive exercises."  (Tr. 476).  Plaintiff's left shoulder x-ray revealed no abnormalities.  (Tr. 477).  Mills "walked with a normal gait and did not demonstrate any limp."  (Tr. 475).  Dr. Cororve noted that "Ms. Mills has some type of problem occurring in her cervical discs to her left scapular region with numbness in her hand and needs to be evaluated further."  (*Id.*).  He advised that Plaintiff be "re-counseled [for] treatment [of] her narcolepsy."  (*Id.*).

On August 19, 2009, Bonnie Blacklock, M.D. ("Dr. Blacklock") reviewed Plainitiff's medical record, on behalf of the Social Security Administration.  (Tr. 528).  From her review of Plaintiff's file, she determined that Mills had a "Non-Severe Impairment."  (Tr. 528).  She remarked, in particular, that

> [Plaintiff is] a 50 [year old] female alleging narcolepsy.  [The] [C[onsulting] E[xaminer's] [] P[hysical] E[xamination] [was] grossly unremarkable.  X[-]R[ay] [of her] left shoulder[] joint [was] normal.  Glenohumeral[19] articulation normal.  Underlying lung is normal.  Soft tissue planes are normal.  [I]n [20]05, she had a sleep study to identify why she had daytime sleepiness, and because of the results,

---

[19] The "glenohumeral joint" is the "shoulder joint, formed by the glenoid cavity of the scapula and the head of the humerus."  Mᴏꜱʙʏ'ꜱ at 694.

> she was issued a [CPAP] machine, and it improved her sleepiness and [she] slept
> well all night with practic[a]lly no arous[a]ls.

(Tr. 528) (emphasis omitted).   On October 17, 2009, James Wright, M.D. affirmed Dr. Blacklock's opinion.  (Tr. 529).

On March 4, 2010, Dr. Shaffer completed a "Sleep Disorders Medical Source Statement" on Plaintiff.  (Tr. 544-549).  Dr. Shaffer reported that Mills suffered from narcolepsy with signs of insomnia, excessive daytime sleepiness, and sleep paralysis.[20]  (Tr. 545).  He claimed that Plaintiff suffered from one to six "recurrent daytime sleep attacks," which typically last "2-10 minutes," and that the attacks could occur suddenly and in hazardous conditions.  (*Id.*).  Dr. Shaffer identified the Multiple Sleep Latency Test ("MSLT") as "positive clinical findings" of Plaintiff's narcolepsy.  (Tr. 546).  Dr. Shaffer determined that Plaintiff could walk only two blocks without stopping, could sit for 45 minutes at one time, and could stand for only 30 minutes before she had to sit.  (*Id.*).  Dr. Shaffer found that Plaintiff could "sit" and "stand/walk" for less than two hours in an eight-hour workday.  (Tr. 547).  The doctor estimated that Plaintiff was "likely to be 'off task' . . . 25% or more" of the workday.  (*Id.*).  Dr. Shaffer concluded that Plaintiff was "[i]ncapable of even 'low stress' work," because of her "frequent sleep attacks." (Tr. 547-48).   Finally, Question 11 of the "Sleep Disorders Medical Source Statement" recognizes that the "patient has a sleep disorder, [and] not a seizure disorder," but it requests that the doctor evaluate whether the patient's impairment is "at least as medically severe" as the following listing:

> 11.03 Epilepsy – nonconvulsive epilepsy (petit mal, psychomotor, or focal) . . .
> occurring more frequently than once weekly in spite of at least 3 months of
> prescribed treatment.  With alteration of awareness or loss of consciousness and
> transient postictal manifestations of unconventional behavior or significant
> interference with activity during the day.

---

[20] "Sleep paralysis" is "when you cannot move as you start falling asleep or when you first wake up.  It may last for up to 15 minutes."  National Institute of Health, http:// www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001805/ (last visited July 9, 2012).

(Tr. 548).   To that inquiry, Dr. Schaffer answered "yes," explaining that Plaintiff "falls asleep with no warning several times during each day."   (*Id.*).   Dr. Schaffer noted that, "[a]s in [an] uncontrolled seizure disorder, Ms. Mills is likely to suffer loss of consciousness precipitously and with potentially severe repercussions."   (*Id.*).

***Educational Background, Work History, and Present Age***

At the time of the administrative hearing, Mills was 51 years old.   (Tr. 33).   She had "completed the eleventh grade," and had "received a GED."   (Tr. 35).   Previously, Mills had worked as an administrative assistant, an executive assistant, and a secretary.   (Tr. 117).

***Subjective Complaints***

Before the ALJ, Mills testified that she had been diagnosed with narcolepsy in 2004.   (Tr. 39).   She said that she had "tried a drug called Provigil" as well as "a breathing machine," and "a special mouth piece for" sleeping to treat her condition.   (*Id.*).   However, she added that "none of [it] worked."   (*Id.*).   Mills reported that she was "not being treated for [narcolepsy] now" and that "it's been quite a while" since she received treatment.   (Tr. 39-40).   She testified that she has "not taken any medication," since 2009, and that she feels "[n]o different[t]" without the medication.   (*Id.*).   Plaintiff stated that she had "tried everything," and that "basically, there's no cure."   (Tr. 41).   Plaintiff explained that her "immune system is weakened" due to the narcolepsy, and that she now "get[s] ill more than [she] used to."   (*Id.*).   Specifically, "the lack of REM sleep" does not allow "the good sleep that [her] body needs to be rested."   (Tr. 52).   She testified that, "back in 2004, I just started taking a lot of time off [of] work sick."   (*Id*)   Mills claimed to "ca[tch] something," such as "viral infections" and "sore throats," every time she "turned around," so now she takes "vitamins that [her] doctor has recommended."   (Tr. 52-53).   Mills reported seeing her doctor, Dr. Shaffer, "several weeks ago" for a "routine test."   (*Id.*).   Plaintiff testified that her lab work revealed "high cholesterol" and a "vitamin D deficiency,"

which Dr. Shaffer treated "with medicine." (*Id*.). Mills denied being treated for or diagnosed with any mental conditions. (Tr. 42).

Mills then testified that she could sit for "twenty" or "thirty minutes," and that she could stand for "30 minutes." (Tr. 42). She also stated that she could lift about "30 pounds," and that she could walk "maybe a couple of . . . blocks." (*Id*.). Plaintiff reported that during the day, she "watch[es] TV," "read[s]," and that "[i]f [she] ha[s] energy, [she] might go outside and take the dog for a walk." (Tr. 42-43). Plaintiff testified that she "do[es]n't cook, [] because [she] may fall asleep while [] cooking." (*Id*.). Mills added that she "burned a couple of cakes falling asleep waiting for them" and that "now [she] just can't trust [her]self to stay awake to cook anything." (Tr. 51). She also stated that she has "left pots of water on to boil that ended up being dry." (*Id*.). Mills testified that she does her own laundry, and uses the computer to "read [] [her] email" and to keep up with the news. (Tr. 43-45). Mills reported having "two [automobile] accidents," because she "fell asleep while driving." (Tr. 51). In the past three years, Mills has taken two trips with her family. (Tr. 46-48). In December 2009, she went to Disney World, and in November 2009, she visited Fredericksburg. (Tr. 46-48). Mills told the ALJ that she did not have any travel planned in the next six months. (Tr. 48).

Mills testified that she "ha[s] no income" and that her "family helps [her]." (Tr. 38). Plaintiff stated that she "live[s] in a house, but [that her] house [is] paid for," because her father "paid cash for it." (*Id*.). She also testified that she lives in Cold Springs, Texas, but that she has a boyfriend who lives in Houston and he "stays [with her] a couple days a week." (Tr. 38, 43-44). She explained that he stays during "the week because . . . he does not work." (*Id*.).

Mills told the ALJ that she last worked in October 2008, for a company that manufactured "drilling jars" used in the oil industry. (Tr. 35-36). Among her responsibilities were "basic secretarial duties," such as using the "phones," and a "computer." (Tr. 36-37). But Mills testified that she also dealt with "contracts," "OSHA regulations," and "handled … the

bills of lading and shipping documents." (Tr. 36-37).  Despite being diagnosed with narcolepsy in 2004, "special conditions" allowed her to work through October 2008.  (Tr. 50).  Mills explained that, because her "father owned the company … they just had to" employ her, even though she "wasn't a productive employee." (Tr. 49).  Plaintiff reported that her "dad took [her] to work"; that she "worked shorter hours"; that she "was able to miss work"; and that she could "nap[] during the day." (Tr. 50).  Mills stated that her doctor had advised her to take naps, and that he said she "would have to take three naps a day." (*Id*.).  Because the doctor recommended that the naps last "[f]or 30 minutes," she "missed lots of work." (*Id*.).  Mills testified that she naps "three or four times" during the day and that the naps last "[a]nywhere from 20 minutes to an hour []." (Tr. 53). She also claimed to "fall[] asleep" sometimes when it is "unplanned." (*Id*.).  Mills told the ALJ that her father eventually sold the company, and that she "was the person they let go." (Tr. 37).  When she was "laid off," she did not file for unemployment because she "knew [she] couldn't seek work." (*Id*.).

Mills testified that the "biggest thing" that prevents her from a return to work is her tendency to "fall asleep without warning." (Tr. at 48).  She added that "it could happen up to six times a day." (*Id*.).  Mills also claimed that she did not sleep well at night. (*Id*.).  She testified that, although she may sleep "probably six [or] eight" hours a night, she "only sleep[s] for short increments at a time, … and then … wake[s] up every hour or so." (*Id*.).  Mills testified that there was "no sleep aid[]" that could help her "go deeper … into [] sleep." (*Id*.).  She does not use her breathing machine or mouth device, because she "end[s] up [] pulling them out of [her] mouth while" sleeping.  (Tr. 49).

Mills then testified that she "fall[s] asleep typing a letter, writing, having a conversation with another person, [or] sitting at [her] desk," and that she has even fallen "asleep standing up before." (Tr. 50).  Mills told the ALJ that she sometimes wakes up because her "head hit[s] the desk or [the] monitor," or because she "fall[s] down." (Tr. 51).  "[W]hen [she] wake[s] up from

one of these episodes, [she is] very disoriented."  (*Id.*).  Mills explained that "it takes [] a good,

probably, 10, 20 minutes" to resume her work duties.  (Tr. 52).

***Expert Testimony***

At the hearing, the ALJ also heard from Herman Litt, ("Mr. Litt"), a vocational expert

witness.  (Tr. 56).  Mr. Litt testified that Mills' past work as a secretary and an executive

assistant qualified as "sedentary in exertional level and skilled."  (Tr. 57).  He also classified her

job as an administrative assistant as "skilled," and noted that "absent the lifting that [Mills] did

occasionally," it was considered "sedentary" work.  (*Id.*).  The ALJ then posed a series of

hypothetical questions to Mr. Litt.  (Tr. 58-59).  Their exchange is set out below:

> Q      We've got here an individual closely approaching advanced age.  She's
> got a high school education; exertional ability to occasionally lift 20 pounds, 10
> pounds frequently; sit/stand/walking ability six of eight [hours in a workday];
> push/pull and gross/fine is unlimited; can occasionally climb stairs; no ladders,
> ropes, scaffolds, or running; she can bend, stoop, crouch, crawl, balance, twist,
> and squat; … I'm going to limit [] the exposure to dust, fumes, gases, and
> chemicals.  I'm going to find there's no mental impairment.  And, based on that,
> can she do any past work?
> A      Yes, sir, she would be able to [do] all of her past work.
> Q      Okay.
> A      … [T]he only issue would be [that] … the administrative assistant job she
> indicated was at the medium exertional level …  As [] it's typically done, she'd be
> able to do that job.
> Q      All right.  Transferable skills?
> A      Yes, sir.
> Q      Could you give me some brief examples [of] what those skills might be?
> A      Well, she has very many clerical skills, computer work, typing, doing
> reports, contracts, … correspondence, a significant amount of telephone work,
> maintained high level records.  So, all of this kind of thing that she did for a
> number of years
> Q      All right.  Okay.  If I lowered the exertional to a sedentary, like ten and
> five, would your testimony change in any way?
> A      No, sir.
> Q      All the other elements remain the same []
> A      Yes. . . . keeping that one job in mind with the conflict with the DOT.

(Tr. 57-59).  Plaintiff's attorney, Mr. Lyons, then asked Mr. Litt a series of questions pertaining

to "the assessment of [the] treating physician."  (Tr. 59).

> Q      Based on th[e] assessment of [Dr. Shaffer], would the Claimant be capable
> of any competitive employment?

17

A     No.

Q     What in that document, specifically, would lead you to that conclusion?

A     Well, there are a number of things.  One, she would miss more than four days a month of work.  Second, [she] would need to take a number of unscheduled work breaks … on a regular basis each day.  Third, [she] would have problems staying on task throughout the workday.  So, those were pretty significant in terms of maintaining employment.

Q     … [A]nd what about the, the attacks that are described --

A     That's another part of it, yeah.

Q     Would that preclude competitive employment as set forth there and also as described by the Claimant here today?

A     Yes.

(Tr. 59-60).  The ALJ then asked whether an added restriction that Plaintiff avoid "heights, dangerous machinery, or uneven surfaces to [the] prior hypothetical [], would … change [Mr. Litt's] testimony at all?"  (Tr. 60).  Mr. Litt testified that it would not.  (*Id.*).  With that answer, no further questions were asked and the hearing concluded.  (Tr. 61).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  (Tr. 23-29).  From his review of the record, he determined that Mills suffers from both "narcolepsy and musculoskeletal pain."  (Tr. 23).  However, he found that Mills "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (*Id.*).  The ALJ described Plaintiff as having "the residual functional capacity to perform sedentary work."  (Tr. 24).  In fact, the ALJ found that Mills is capable of performing her past relevant work as a secretary, executive assistant, and administrative assistant.  With that conclusion, he denied Mills' application for benefits.  (Tr. 29).

Before this court, Plaintiff complains that the ALJ did not evaluate her narcolepsy diagnosis under Listing 11.03.  (Plaintiff's Motion at 5).  In addition, Plaintiff argues that the ALJ "failed to follow the opinion of [Mills'] Treating Physician who found [her] disabled." (Plaintiff's Motion at 9, 20).  Mills also claims that the ALJ "placed himself in the role of Doctor," because no medical expert testified about her impairments.  (*Id.* at 6).  Defendant, on the other hand, insists that the "[t]he ALJ properly evaluated Plaintiff's claim using relevant

legal precedent, and [that] substantial evidence supports his decision [that] [] Plaintiff [is] not disabled." (Defendant's Motion at 12).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Further, a finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

*Listing 11.03*

Plaintiff argues that the ALJ erred in concluding that her disability does not medically equal SSA Listing 11.03. (Plaintiff's Motion 6). Mills complains that "the ALJ utterly failed to even mention the § 11.03 Epilepsy Listings and further erred by failing to recognize Narcolepsy as a neurological disorder, which has no cure." (*Id*.) (emphasis omitted). Defendant, however, maintains that "the medical evidence . . . clearly indicates that Plaintiff[] did not meet or functionally equal a listed impairment after her treatment with a CPAP, a dental orthotic, and proper medication." (*Id*.). Defendant points out further that the "ALJ specifically stated that Plaintiff did not meet or medically equal Listings 3.10 through Listing 12.02, which would include Listing 11.03." (Defendant's Response 9). Although the ALJ found Plaintiff's narcolepsy condition to be "severe," the ultimate issue is whether it reaches the severity required by Listing 11.03.

At the outset, it is critical to note that Listing 11.03 addresses epilepsy, and not narcolepsy. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03. However, the SSA's Program Operations Manual (the "Program Manual"), provides some guidance on the "Evaluation of Narcolepsy." (Plaintiff's Motion, Ex. A) (citing Program Operations Manual Systems ("POMS") DI 24580.005, Evaluation of Nacolepsy). The Program Manual states that, "[a]lthough

narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the

closest listing to equate narcolepsy with is Listing 11.03, Epilepsy—Minor motor seizures."

(*Id*.).  Listing 11.03 describes "nonconvulsive epilepsy," which includes

> [A] detailed description of a typical seizure pattern, including all associated
> phenomena; occurring more frequently than once weekly in spite of at least 3
> months of prescribed treatment. With alteration of awareness or loss of
> consciousness and transient postictal manifestations of unconventional behavior
> or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.03.  "Narcolepsy," is defined in the Program Manual as

"a chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep

accompanied by three accessory events: [c]ataplexy," "[h]ypnagogic hallucinations," and

"[s]leep paralysis."  (Plaintiff's Motion, Ex. A) (citing POMS DI 24580.005, Evaluation of

Nacolepsy, (A)).  The Program Manual also recognizes that "[n]ot all individuals will have all of

the symptoms."  (*Id*. at (B)).

From the evidence of record, Dr. Shaffer concluded that Plaintiff's narcolepsy was "at

least as medically severe" as epilepsy, as described in Listing 11.03.  (Tr. 548) (emphasis

omitted).  In his opinion, Mills met the Listing, because she would "fall[] asleep with no warning

several times during each day," and because "[a]s in [an] uncontrolled seizure disorder, [she] is

likely to suffer [a] loss of consciousness precipitously and with potentially severe repercussions."

(*Id*.).  However, in reaching these conclusions, Dr. Shaffer failed to detail all of the specific

requirements of Listing 11.03.  For example, the Social Security Regulations mandate that,

"[u]nder … 11.03, the criteria can be applied only if the impairment persists despite the fact that

the individual is following prescribed [] treatment."  20 C.F.R. Pt. 404, Subpt. P, App. 1 at 11.00

(A).  Here, the record is replete with evidence that Mills failed to comply with her "prescribed

treatment."   In fact, in April 2009, Dr. Shaffer reported that, although he had prescribed

Phentermine for Mills, she had "no[t] tried [it] yet."  (Tr. at 289).  Dr. Corove's notes further

confirm that Plaintiff "did not want to take [her] medication," and Mills herself conceded that

she did not use her inhaler "on a regular basis." (Tr. 58, 475). Finally, at the hearing, Plaintiff

testified that, "[s]ince 2009, [she] ha[s] not taken any medication." (Tr. 40). From this evidence,

it is clear that Plaintiff was not compliant with her treatment regimen.

An ALJ is entitled to consider a claimant's noncompliance with treatment in assessing

the claimant's symptoms. *Robinson v. Astrue*, No. H-09-2497, 2010 WL 2606325 at *8 (S.D.

Tex. Jun. 28, 2010), citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). Moreover,

Listing 11.03 is applied only "if the impairment persists despite the fact the individual is

following prescribed [] treatment." 20 C.F.R Pt. 404, Subpt. P, App. 1. Because Mills did not

follow her "prescribed treatment," it is not appropriate, or even possible, to evaluate her

condition, under Listing 11.03. For that reason, it was not error for the ALJ to omit a specific

discussion of it.

Further, the Program Manual notes that narcolepsy is "accompanied by [the] three

accessory events" of "[c]ataplexy," "[h]ypnagogic hallucinations," and "[s]leep paralysis."

(Plaintiff's Motion, Ex. A ("POMS") DI 24580.005 (A)). And, while the Program Manual

provides that "[n]ot all individuals [with narcolepsy] will have all of the symptoms," Listing

11.03 requires a "detailed description" of the epileptic, or in this case, narcoleptic, event

"including all associated phenomena." [21] (*Id*. at (B)); 20 C.F.R Pt. 404, Subpt. P, App. 1. In

August 2005, Dr. Reinoso found that Mills had "[no] cataplexy; [no] sleep paralysis; [and] [no]

hypnagogic hallucination[s]." (Tr. 188-89). Four months later, he again concluded that Plaintiff

suffered from "[n]arcolepsy without cataplexy." (Tr. at 198, 533). In addition, while Dr.

Shaffer's Medical Source Statement recites that Plaintiff experienced "sleep paralysis," his

previous treatment records indicate that Mills did not exhibit this symptom. (Tr. 188, 545). On

this record, there is no showing that Plaintiff experienced all three of the "accessory events" of

---

[21] The court is unable to locate any authority that points to a difference between "associated phenomena," as it appears in Listing 11.03, and "accessory events," from the Program Manual's directive on the "Evaluation of Narcolepsy." 20 C.F.R Pt. 404, Subpt. P, App. 1; (Plaintiff's Motion, Ex. A ("POMS") DI 24580.005 (A)).

narcolepsy.  (Tr. at 178-549).  This absence of evidence underscores that Plaintiff's condition does not meet the severity requirement of Listing 11.03.

Finally, although an ALJ is not required to do an exhaustive point-by-point discussion of each applicable Listing, the ALJ here stated, explicitly, that Plaintiff "does not meet or medically equal listing 3.10 through listing 12.02."  (Tr. 24); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).  Because Listing 11.03 is included within the range of Listings that the ALJ cited, it is clear that he considered Plaintiff's symptoms under it.  For these reasons, Plaintiff presents no basis for remand on this issue.

*Weight Given to the Treating Physician's Opinion*

Plaintiff next complains that the ALJ "failed to follow the opinion of [her] treating physician who found [her] disabled."  (Plaintiff's Motion at 9).  It is true that the SSA regulations require the Commissioner to evaluate every medical opinion that is received in evidence on a claimant's behalf.   20 C.F.R. § 404.1527(d).  Generally, more weight is given to the opinion of a treating physician than to those given by other medical professionals, including examining physicians and medical expert witnesses.  *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 381, 354 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237; 20 C.F.R. § 404.1527(d)(2).  A "treating" physician is one "who has provided medical treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the claimant."  *Hernandez v. Astrue*, 278 Fed. Appx. 333, 338 n. 4 (5th Cir. 2008) (citing 20 C.F.R. § 404.1502).  It is well-settled that an ALJ cannot reject the opinion of a treating physician without "good cause" to do so.  *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455–56.  "Good cause" may exist if the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence."  *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.  Further, a treating physician's

finding that a claimant is "disabled" or is "unable to work," is not a medical opinion for which deference is required. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *see also* 20 C.F.R. §404.1527(d). That determination is instead a legal conclusion which is reserved solely for the Commissioner. *Id*.

In his opinion, the ALJ acknowledged Dr. Shaffer as Plaintiff's treating physician. (Tr. 25-26). Ultimately, however, he "afford[ed] [Dr. Shaffer's opinion] little weight," because "it [wa]s not supported by the objective medical evidence of record." (Tr. 28). He first pointed to Dr. Shaffer's findings in his Medical Source Statement. (Tr. 545-49). In that report, Dr. Shaffer determined that Plaintiff could "[s]it," and "[s]tand/walk," less than two hours "***total in an 8-hour working day***." (Tr. 546) (emphasis in original). Dr. Shaffer also found that Mills could lift only ten pounds "occasionally," and that she could only "rarely" lift twenty pounds. (Tr. 547). However, eight months earlier, on July 21, 2009, Dr. Corove examined Mills and found her "[m]usc[le] strength" to be "normal," with a "full range of motion [in] all [of her] joints." (Tr. 476). *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (finding that "competing first-hand evidence" may provide grounds for failing to give proper weight to a treating physician's opinion) (citing *Spellman v. Shalala*, 1 F.3d 357, 365 (5th Cir. 1993)).

More importantly, Dr. Shaffer's own records are inconsistent. For instance, in his Medical Source Statement, Dr. Shaffer noted that Plaintiff suffers from "sleep paralysis," but previously he had concluded that Mills did not exhibit that symptom. (Tr. 188, 545). *See Greenspan*, 38 F.3d at 237 (upholding an ALJ's decision when the treating physician's diagnosis "was contradicted by both itself and outside medical evidence"). In addition, the ALJ emphasized that Plaintiff "acknowledged (through her testimony and within various function reports regarding her disabilities) that she is physically capable of more than Dr. Shaffer indicates she can do." (Tr. 28). In fact, Mills testified that she could lift about "30 pounds," while Dr. Shaffer found that she could only "occasionally lift ten pounds." (Tr. 547). And,

although Dr. Shaffer concluded that Mills was incapable of even "low stress work," Plaintiff admitted that she "handle[s] stress well." (Tr. 133, 152).

Finally, the ALJ did not reject Dr. Shaffer's opinion outright, and he incorporated certain findings in his assessment of Plaintiff's RFC. For example, the ALJ limited Mills to lifting and carrying "no more than 10 pounds at a time," as did Dr. Shaffer. (Tr. 24, 547). It is true that the ALJ here afforded Dr. Shaffer's opinion "little weight," but his reasons for doing so were clear, and "good cause" existed for that decision. *Myers*, 238 F.3d at 621; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456. Plaintiff presents no basis for remand on this issue.

*Medical Expert*

As a final matter, Plaintiff makes a fleeting argument that the ALJ erred by not "calling a Medical Expert to testify regarding [Plaintiff's] impairments." (Plaintiff's Motion at 6); (Plaintiff's Reply at 2-3). Mills maintains that a medical expert witness would have assisted the ALJ here, by directing him to consider Listing 11.03, as well as to advise him before "disregard[ing] the disability opinion" from Dr. Shaffer. (Plaintiff's Motion at 6); (Plaintiff's Reply at 2-3). Defendant, citing Social Security Regulation 96-6p, responds that "the opinions of a state agency medical consultant satisf[y] the requirement of a medical expert." (Defendant's Response at 9) (citing SSR 96-6p, 61 FR 34466, 1996 WL 362203, at 34468 n. 2, citing 20 C.F.R. § 404.1512(b)(2)). That regulation provides that, "[w]hen an administrative law judge … finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by … documents signed by a State agency medical … consultant." SSR 96-6p, 61 FR 34466, 1996 WL 362203, at 34468. In this instance, the record holds opinions from two different SSA physicians, both of whom determined that Plaintiff's impairments were not severe. (Tr. 528, 529). For that reason, the ALJ satisfied his "requirement to receive expert opinion evidence into the record." SSR 96-6p, 61 FR 34466, 1996 WL 362203, at 34468.

Despite that finding, "[w]hen additional medical evidence is received that in the opinion of the ALJ may change the State agency medical or psychological consultant's findings, an updated medical opinion regarding disability is required." *See Brister v. Apfel*, 993 F.Supp. 574, 578 (S.D. Tex. 1998).  Here, Plaintiff has not pointed to any "additional evidence that the ALJ should have considered, nor does she cite any "additional evidence" which would have changed the result.  Moreover, an updated medical opinion is required only if, "*in the opinion of the ALJ*," the additional evidence will change the state agency findings.  *Brister*, 993 F. Supp. at 578 (emphasis in original).  The Social Security regulations state that, "Administrative law judges *may* also ask for and consider opinions from medical experts on the nature and severity of your impairment(s)."  20 C.F.R. § 404.1527(f)(2)(iii) (emphasis added).  But it is within the discretion of the ALJ to request a medical expert opinion.  20 C.F.R. § 404.1527(f)(2)(iii); *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).  Because there is no showing of specific "additional evidence" which could have "change[d] the State agency medical or psychological consultant's findings," the ALJ's decision not to consult a medical expert was not error.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendant's motion be **GRANTED,** and that Plaintiff's motion be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the

chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

      **SIGNED** at Houston, Texas, this 15th day of August, 2012.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**